| | | |
|---|---|---|
| GUSTAVO BONILLA | * | NO. 2022-CA-0625 |
| VERSUS | * | |
| | | COURT OF APPEAL |
| VERGES ROME ARCHITECTS | * | |
| - A PROFESSIONAL | | FOURTH CIRCUIT |
| ARCHITECTURAL | * | |
| CORPORATION, PIVOTAL | | STATE OF LOUISIANA |
| ENGINEERING LLC, STEVEN | * * * * * * * | |
| HANNAH ROME AND JAMES | | |
| E. AMEDEO | | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2019-02366, DIVISION "G-11"
Honorable Robin M. Giarrusso, Judge
* * * * * *
**Judge Roland L. Belsome**
* * * * * *

(Court composed of Judge Roland L. Belsome, Judge Joy Cossich Lobrano, Judge
Tiffany Gautier Chase)

**LOBRANO, J. CONCURS IN THE RESULT**

Caleb H. Didriksen, III
Erin Bruce Saucier
Carl A. "Trey" Woods, III
DIDRIKSEN SAUCIER & WOODS
3114 Canal Street
New Orleans, Louisiana 70119

      COUNSEL FOR PLAINTIFF/APPELLANT

Terrence L. Brennan
Kelly E. Theard
Brian S. Schaps
Juan J. Miranda
DEUTSCH KERRIGAN, LLP
755 Magazine Street
New Orleans, Louisiana 70130

      COUNSEL FOR DEFENDANT/APPELLEE

      **REVERSED AND REMANDED**
      **May 11, 2023**

RLB
JCL
TGC

This action arises out of a workplace accident. The plaintiff, Gustavo Bonilla ("Mr. Bonilla"), appeals the June 30, 2022 judgment granting a motion for summary judgment in favor of Verges Rome Architects, APAC and Steven Hannah Rome (collectively, "VRA") For the reasons that follow, we reverse and remand.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Mr. Bonilla filed a petition for damages alleging that on March 7, 2018, he was injured while working as a subcontractor on a construction project ("Project") at the Allie Mae Williams Multiservice Center ("Center"). At the time of the accident, the Center was being renovated by its owner, the City of New Orleans ("City"). In connection with the renovations, the City entered into a contract ("Construction Contract") with Tuna Construction, LLC ("Tuna"), as the general contractor. Tuna subcontracted with Mr. Bonilla's employer, Meza Services, Inc. ("Meza"), to perform demolition services on the Project. The City also executed a Professional Service Agreement ("Design Contract") with VRA as the "Consultant" on the Project, for "professional design and contract administration

1

services."  VRA retained Morphy Makofsky, Inc. ("MMI") as its consultant to provide certain engineering services.

At the time of the accident, Mr. Bonilla was directed by his employer to demolish a vault that was located on the second floor of the Center.  The vault is described in the record as a ten-foot by ten-foot cinderblock concrete room, with a nine foot high concrete slab ceiling.  Mr. Bonilla testified in his deposition that after demolishing most of one of the side walls of the vault and a smaller section of the front wall, he was instructed to stand on top of the vault's concrete ceiling in order to demolish it with a hydraulic jackhammer.

Shortly after beginning that task, the entire vault structure collapsed.  At the time, Mr. Bonilla was wearing a harness, which he tethered to a pipe above the vault.  Although the harness somewhat broke his fall, Mr. Bonilla sustained neck and back injuries.

Mr. Bonilla filed suit against VRA, as the architect and MMI, as the engineer on the Project.[1]  Generally, as to both VRA and MMI, the petition alleges negligence in the preparation and approval of the design plans and specifications, the failure to design and/or require support for the area being demolished, and the failure to monitor and supervise the execution of the plans to ensure safety at the jobsite.

VRA filed a motion for summary judgment asserting that pursuant to the relevant contracts on the project, it did not owe a duty to oversee, supervise or maintain the construction site, or Mr. Bonilla's safety.  In support of its motion, VRA submitted: 1) the affidavit of its Vice President, Mr. Rome; 2) the Design

---

[1] Pivotal Engineering, LLC and James E. Amedeo, were also named as defendants but were voluntarily dismissed.

Contract executed between the City and VRA; 3) the Construction Contract executed between the City and Tuna; and 4) the contract documents included in the City's Capital Projects Administration Division 0 Standard Projects, which included the General Conditions of the Construction Contract ("General Conditions").

In opposition to the motion for summary judgment, Mr. Bonilla argued before the trial court that there were genuine issues of material fact as to whether VRA owed him a duty to provide a safe work environment, and whether that duty was violated. Introduced in support of that position, were: 1) the depositions of Mr. Bonilla, Anthony Taffaro, an architect with VRA ("Mr. Taffaro"), and Mr. Rome; and 2) the affidavits and reports from expert witnesses, Jerry L. Householder ("Mr. Householder") and James P. Labarre ("Mr. Labarre"). After the submission of evidence and oral argument, the trial court granted summary judgment in favor of VRA.[2] Mr. Bonilla's motion for new trial was denied, and his timely appeal followed.

**SUMMARY JUDGMENT PRINCIPLES AND STANDARD OF REVIEW**

"The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action" and the favored procedure "shall be construed to accomplish these ends." La. C.C.P. art. 966(A)(2). "After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(A)(3).

---

[2] MMI filed a similar motion for summary judgment, which was granted on September 23, 2022. While the matters were consolidated for purposes of oral argument, the ruling as to MMI is addressed in a separate opinion. *See* 2022-CA-0802.

As this Court recognized in *Bercy v. 337 Brooklyn, LLC*, 2020-0583, pp. 3-4 (La. App. 4 Cir. 3/24/21), 315 So.3d 342, 345, *writ denied*, 2021-00564 (La. 6/22/21), 318 So.3d 698,

> La. C.C.P. art. 966(D)(1) provides that on a motion for summary judgment, although the burden of proof rests with the mover, if the mover will not bear the burden of proof at trial, the mover must only point out the absence of factual support for one or more elements essential to the adverse party's claim. The burden then shifts to the adverse party who has the burden to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

A genuine issue is one as to which reasonable persons could disagree, "[i]f on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for trial on that issue[,]" and summary judgment is appropriate. *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 751. "A fact is material when its existence or nonexistence may be essential to the plaintiffs [sic] cause of action under the applicable theory of recovery; a fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute." *Chapital v. Harry Kelleher & Co., Inc.*, 2013-1606, p. 5 (La. App. 4 Cir. 6/4/14), 144 So.3d 75, 81 (quotation omitted). Whether a fact is material is a determination that must be made based on the applicable substantive law. *Roadrunner Transp. Sys. v. Brown*, 2017-0040, p. 7 (La. App. 4 Cir. 5/10/17), 219 So.3d 1265, 1270 (citing *Smith*, 93-2512, p. 27, 639 So.2d at 751).

Finally, it is well-settled that "[i]n determining whether an issue is genuine for purposes of a summary judgment, courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence." *Robertson v. Kearney Cos., Inc.*, 2020-0605, p. 4 (La. App. 4 Cir. 3/25/21), 315 So.3d 931, 935

4

(quoting *Estate of Alix v. Wells*, 2007-0503, p. 3 (La. App. 4 Cir. 12/12/07), 974 So.2d 63, 65).

**LAW AND ANALYSIS**

VRA asserted in its motion for summary judgment that pursuant to the relevant contract documents: 1) it had no obligation to supervise or inspect the work of Tuna or any of its subcontractors; 2) it had no control over the means and methods of construction; and 3) it was not responsible for safety at the site. VRA maintains that whether a duty exists is a question of law, thus the only issue on appeal is whether VRA, as the design professional on the Project, owed a duty to a subcontractor's employee under the facts presented in this case.

In support of its motion for summary judgment, VRA submitted the affidavit of its Vice President, Mr. Rome, stating:

- In accordance with the General Conditions, VRA was neither responsible for nor controlled the 'means, methods, safety precautions and programs.'

- In accordance with the General Conditions, Tuna was 'entirely responsible' for all construction means and methods of the Project.

- While VRA made periodic site visits and observations in accordance with the Design Agreement, the General Conditions clearly provide that these actions 'shall not be construed as supervision of actual construction.'

- In accordance with the General Conditions, Tuna was 'responsible for all cutting, fitting, or patching that may be required to complete the Work.'

- In accordance with the General Conditions, Tuna was 'responsible for initiating, maintaining and supervising all safety precautions and programs', along with having to take reasonable precautions to prevent damage, injury, or loss of employees or other persons affected by the work.

- In accordance with the General Conditions, Tuna was responsible 'for the adequate strength and safety of scaffolding, staging, and hoisting equipment and for temporary shoring, bracing and tying.'

- Pursuant to the contractual obligations set forth in relevant Contract Documents, VRA and I did not owe a duty to maintain, monitor, or ensure the safety of the Plaintiff on the Project.

In his deposition testimony, Mr. Rome explained that the demolition of the vault was included in the original design plans, but that it was up to the contractor to decide how it would be taken down. He stated that VRA did not provide structural plans for the vault demolition, and gave no verbal instructions to the contractor related to the demolition of the vault.

Mr. Rome testified that once the work began, it was VRA's job to assist the owner in observing the work for quality control, to see that the contractor was adhering to the contract requirements, and to answer or clarify any questions that the contractor may have. He acknowledged that the contractor's superintendent would be informed if something was not in compliance with the design drawings.

VRA points to Section F(8) of the Design Contract, which provides:

The Consultant [VRA] shall have no control over, charge of, or responsibility for the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, nor shall the Consultant be responsible for the Contractor's failure to perform the Work in accordance with the Construction Documents. The Consultant shall not have control over or charge of, and shall not be responsible for, acts or omissions of the Contractor or of any other persons or entities performing portions of the Work.

VRA also relies on the General Conditions in the Construction Contract, which provide, in pertinent part:

2.3     The Consultant and the Owner will provide general administration of the construction contract with the Consultant providing the administration of the Contract as related to the actual construction process and technical questions arising out of said construction. The undertaking of periodic visits and observations by

the Consultant or his associates shall not be construed as supervision of actual construction.

2.4 The Consultant will visit the site periodically to familiarize himself with the progress and quality of the work. On the basis of his observations he will keep the Owner informed of the progress of the work and shall submit weekly reports with photographs. The Consultant shall endeavor to protect the Owner against defects in the work.

2.5 The Consultant will not be responsible for nor control the construction means, methods, safety precautions and programs. The Consultant will not be responsible for the Contractor to carry out the work in accordance with the Contract Documents, or the Contractor's acts or omissions or the acts or omissions of his Subcontractors or employees.

4.7 The Contractor shall direct the work using his full attention and shall be entirely responsible for all construction means and methods.

10.1 The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs. He shall take all reasonable precautions for the safety and shall take all reasonable steps to prevent damage, injury, or loss of the work itself and all material and equipment incorporated; or property at the site or adjacent thereto, and all employees or other persons affected by the work.

10.3 The Contractor shall erect and maintain, as required by existing conditions and progress of the work, all reasonable safeguards for safety and protection….

10.6 The Contractor shall be responsible for the adequate strength and safety of all scaffolding, staging and hoisting equipment and for temporary shoring, bracing and tying.

10.8 The Contractor shall designate a responsible member of its organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and the Consultant.

Considering the above, VRA submits that Mr. Bonilla failed to present any evidence that VRA owed a duty for the means, methods or safety with regard to the demolition of the vault.

Regarding VRA's duty, Mr. Bonilla points to the requirements set forth in Section F(5) of the Design Contract, which provides, in pertinent part:

> On the basis of its on-site observations, the Consultant will keep the Owner informed of the progress and quality of the work performed, and report known deviations from the Contract Documents, deviations from the most recently approved construction schedule, and shall endeavor to protect the Owner against defects and deficiencies observed in the Work.

Mr. Bonilla also relies on the deposition testimony of Mr. Taffaro, wherein he acknowledged that one of his duties as an architect for VRA was to periodically visit the jobsite to observe the progress of the work, and to "make sure that it's being performed in accordance with the design content and the drawings." Mr. Taffaro stated that VRA's demolition documents pertaining to the vault instructed the contractor to remove the existing vault (referred to as "safe") walls, door, and frame. He explained that the demolition documents were general instructions to remove the vault, including the ceiling and associated fixtures. Mr. Taffaro reiterated that according to the Construction Contract, the contractor determines the methods he uses to do the work, and he determines and controls any safety conditions.

Mr. Taffaro was asked about Section 3.6 of VRA's Project Manual (included in the Design Contract with the City), which provided that when cutting or patching, the contractor would "provide temporary support of work to be cut." Mr. Taffaro explained that the provision required the contractor to provide support in order to prevent anything from falling to the floor, and causing damage. He further stated that the Project Manual stipulated that during demolition, the contractor was required to use methods least likely to cause damage to the elements retained or adjoining construction. It also provided that "[i]n general, the contractor was to

8

"use hand or small power tools designed for sawing and grinding, not hammering and chopping." Mr. Taffaro acknowledged that these provisions of the Project Manual would have applied to the elements that were going to be removed from the vault.

Mr. Taffaro also confirmed that the Section 3.1(E) of the Project Manual required the contractor to engage an engineer to perform an engineering survey to determine whether removing any element of the building might result in structural deficiency or unplanned collapse during demolition.[3] He did not know if Tuna engaged its own engineer.

Mr. Taffaro identified ten photographs, which he took during one of his visits to the site. The photographs were taken on the day of Mr. Bonilla's accident, although Mr. Taffaro was no longer onsite when the accident occurred.

In particular, one photograph shows Mr. Bonilla standing on scaffolding, with his hand on the roof of the vault. Two other workers are shown standing on the floor below him. The photograph also shows the vault with much of the side wall and a smaller portion of the front wall demolished. The door to the vault is partially open. Visible on the floor immediately adjacent to the vault are large pieces of rubble, evidently from the demolition of the vault's cinderblock walls.

Mr. Taffaro acknowledged in his deposition that there were no temporary supports in place on the vault at the time he took the photographs. He further stated that he could not see inside the vault to tell if there were temporary supports on the inside. Mr. Taffaro explained that he could not say if temporary supports were necessary because he did not know how the contractor proposed to demolish

---

[3] Section 4.30 of the Construction Contract's General Conditions states that "[t]he Contractor shall provide competent engineering services to execute the work in accordance with the Contract requirements."

the vault. Mr. Taffaro did not point out the lack of temporary shoring to anyone at the time.

Mr. Taffaro testified that he did not see anything wrong or unsafe in what the workers were doing at the time he took the photographs. Mr. Taffaro explained that he knew they were required to demolish the entire vault, but he did not know whether they were taking it down at that point in time. He made no inquiry. When asked what he would do if he did see anything unsafe, Mr. Taffaro explained that he would discuss the matter with the contractor's superintendent.

Mr. Bonilla testified in his deposition that his supervisor with Meza told him to stand on the concrete roof of the vault and break it up with a jackhammer. At that time, some of the vault's walls were already broken down. Mr. Bonilla explained that while operating the jackhammer, the concrete slab ceiling collapsed. After landing in a squatting position, the jackhammer pulled him onto his side. Mr. Bonilla stated that as a result of the accident he has undergone back surgery and will need surgery on his neck.

Mr. Householder, a civil and structural engineer and general contractor, opined on behalf of Mr. Bonilla that:

> It is clear to me that even a layman who is not a trained design professional should have recognized that partially removing the walls without providing substitution supports made the ceiling slab unstable. There is no evidence in Taffaro's pictures of substitute supports in place. It should have been obvious to everyone that it was more dangerous to jackhammer on the ceiling slab after having remove parts of two of its support walls.

Mr. Labarre, an architect and general contractor, stated in his report that VRA had a contractual obligation to ensure that the contractor's work was being done in accordance with the contract provisions. One of Tuna's obligations was to engage a professional engineer. Mr. Labarre found no record that VRA notified or

cited Tuna for non-compliance with that obligation. He opined that if VRA, as required by its contract, had cited lack of compliance, and required the contractor to engage an engineer, the incident may have been prevented. Finally, Mr. Labarre stated:

> While agreeing that VRA is not responsible for means or methods, as a licensed architect with a master's in architecture, I offer that Mr. Taffaro has some basic knowledge of structures and as evidenced by the photographs, if demolition were to continue on the vault with no temporary supports, there was a potential for problems.

On appeal, Mr. Bonilla argues generally that genuine issues of material fact remain. Specifically, he sets forth one assignment of error, asserting that the trial court overlooked duties owed by an architect and engineer to the general public, created by Louisiana jurisprudence and statute, asserting that the trial court did not evaluate La. R.S. 38:2216, which prohibits a limitation of liability on architects and/or engineers in contracts with public bodies. He argues that La. R.S. 38:2216 renders null and void any hold harmless agreement which purports to shelter an architect or engineer from damages. The statute provides in pertinent part:

> G. It is hereby declared that any provision contained in a public contract, other than a contract of insurance, providing for a hold harmless or indemnity agreement, or both,
>
> (1) From the contractor to the public body for damages arising out of injuries or property damage to third parties caused by the negligence of the public body, its employees, or agents, or,
>
> (2) From the contractor to any architect, landscape architect, engineer, or land surveyor engaged by the public body for such damages caused by the negligence of such architect, landscape architect, engineer, or land surveyor
>
> is contrary to the public policy of the state, and any and all such provisions in any and all contracts are null and void.

11

In response to Mr. Bonilla's assignment of error regarding La. R.S. 38:2216, VRA submits that the statute was never referenced in the trial court proceedings. Thus, it is not properly preserved for appeal. Moreover, VRA argues that the statute is inapplicable here because it applies only to nullify indemnification and hold harmless provisions requiring the contractor to hold harmless an architect or engineer for their own acts of negligence. VRA points out that the relevant contracts on the Project contain no such provisions.

We agree that La. R.S. 38:2216 is not applicable in case before us. The contracts at issue here contain no provisions that would require Tuna to indemnify or hold harmless VRA for its own negligence. Furthermore, we find no merit in Mr. Bonilla's assertion that the provision in the Design Agreement, which states that VRA has no duty to oversee safety at the construction site, amounts to a prohibitive indemnity provision. Rather, the contracts simply delineate the duties and responsibilities of each of the parties involved in the Project. Mr. Bonilla's reliance on La. R.S. 38:2216 is misplaced.

The pertinent issue before us in this appeal is whether the express provisions of the relevant contracts imposed a duty on VRA. It is well established in our jurisprudence that "[w]hether a duty is owed is a question of law; whether defendant has breached a duty is a question of fact." *Brewer v. J.B. Hunt Transp., Inc.*, 2009-1408, p. 14 (La. 3/16/10), 35 So.3d 230, 240. Moreover, as this Court held in *Black v. Gorman-Rupp*, 2000-1223, p. 5 (La. App. 4 Cir. 7/11/01), 791 So.2d 793, 796 (quoting *Yocum v. City of Minden*, 26,424, pp. 3-4 (La. App. 2 Cir. 1/25/95), 649 So.2d 129, 132), "in

12

determining the duty owed to an employee of a contractor by an engineering firm also involved in the project, the court must consider the express provisions of the contract between the parties." *See also Young v. Hard Rock Constr., L.L.C.*, 19-0484, p. 7 (La. App. 5 Cir. 3/17/20), 292 So.3d 178, 184.

In arguing that it had no contractual duty to Mr. Bonilla, VRA relies on the holdings in *Black* and *Young*. However, for the reasons explained more fully below, we find those cases distinguishable on the facts.

In *Black,* the Sewerage and Water Board of New Orleans entered into a contract with T.L. James Construction Co. ("T.L. James") as the general contractor, and Pepper & Associates ("Pepper") as the engineer on a drainage construction project. Mr. Black, an employee of T.L. James was killed when a pump fell into the excavation site. The petition for damages alleged Pepper's negligence in failing to properly supervise the work and in failing to provide a safe job site. Pepper moved for summary judgment arguing that their contract with the Sewerage and Water Board was for engineering services to check that the work complied with the contract requirements. Additionally, Pepper asserted that they had no responsibility for site safety and had no knowledge of the alleged dangerous condition concerning the placement of the pump. The trial court granted summary judgment in favor of Pepper. On appeal, this Court affirmed, finding as follows:

> The only way a legal duty to act can arise from the facts before this Court, is if the contract between the Sewerage and Water Board and T.L. James and the Sewerage and Water Board and Pepper lead to the conclusion that Pepper was responsible for performing those activities that appellant alleges that Pepper failed to perform. After a

13

careful review of the contracts we are of the same opinion as the trial court that Pepper did not have a contractual obligation to supervise construction or site safety. The mere fact that Pepper was involved in the construction process and had contractual duties to the Sewerage and Water Board does not create an all encompassing duty to protect everyone from every risk which could be encountered during the course of the project. To defeat the summary judgment the plaintiff cannot merely allege that Pepper owed a duty to Ronnie Black, but must demonstrate some basis in law for the imposition of this duty. In the absence of such a duty there can be no liability on the part of Pepper.

*Black,* 2000-1223, p. 5, 791 So.2d at 795-96.

In *Young,* the plaintiff was injured on a construction site at East St. John High School when the walls of a trench in which he was laying drainage pipe, collapsed. He sued both his employer, Hard Rock Construction of Louisiana, LLC ("Hard Rock"), and All South Consulting Engineers, L.L.C. ("All South"), the engineer on the project. The trial court granted summary judgment in favor of All South, finding:

Here, the American Institute of Architects contract utilized in determining the roles of the parties and the duties between them used clear and explicit terms. Section 4.2.2 states that the engineer will not have "control over, charge of, or responsibility for ... safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities[.]" *All South Ex. C, § 4.2.2 at 21.* It is apparent that the parties intended to hold only one party, Hard Rock Construction, liable for safety precautions. Indeed, the same contract provides that the contractor is "solely responsible" for all instrumentalities of the construction job. *All South Ex. C., § 3.3.1 at 14-15.* The contract intends for the engineer to be in charge of determining the date of substantial compliance, preparing change orders, reviewing contractor submissions, and keeping the owner informed on the progress of the work.

*Young,* 19-0484, p. 5, 292 So.3d at 183.

On appeal, the Court affirmed the granting of summary judgment in favor of All South, reiterating that the duty owed to Mr. Young was governed by All South's contract with the School Board. The Court noted

14

that pursuant to the contract, Hard Rock was solely responsible for the means and methods of construction and for its workers' safety. Thus, the Court found no genuine issues of material fact as to All South's non-liability to Mr. Young under the express provisions of the contract.

Clearly, the *Black* and *Young* cases stand for the pronouncement that the duty owed by an engineer (or architect) on a construction project is dictated by the contracts. In the present case, as with *Black* and *Young*, the contracts provided that the contractor was responsible for the means and methods of construction and for safety. Beyond that comparison, we find those cases to be distinguishable. Specifically, in *Black* and *Young*, there was no evidence presented to demonstrate that the engineer on the project was aware of any unsafe conditions. However, in this case, we believe there are questions of fact as to whether VRA was aware that the vault was being demolished in an unsafe manner and that deviations from the contract had occurred.

VRA acknowledged that it had a contractual duty to make site visits to make sure the contractor was operating in accordance with the design plans. As previously noted, VRA also had a contractual duty to report any deviations from the contracts.

Here, particularly after considering the photographs taken by Mr. Taffaro on the date of the accident, there are clear indications that violations, or deviations from the contract were occurring that Mr. Taffaro should have observed and reported. As previously noted, Mr. Taffaro testified that he saw no shoring or bracing on the outside of the vault; shoring and bracing during demolition was required by the contracts. Mr. Taffaro also claimed

15

that he could not see inside the vault to know whether there was bracing on the inside. This assertion is questionable given the fact that at the time he took the photographs, one side wall was almost entirely demolished and the door to the vault was partially open.

Additionally, the Project Manual provided the selective demolition for masonry as follows: "Demolish in small sections. Cut masonry at junctures with construction to remain, using power-driven saw, then remove masonry between saw cuts." The photographs taken by Mr. Taffaro show large pieces of rubble, indicating that the vault was likely being demolished by other means, *i.e.*, with the use of hammering. Both the lack of bracing and the method used to demolish the vault would appear to be deviations from the contract requirements that VRA did not report to Tuna or the City.

VRA denies that Mr. Taffaro witnessed anything unsafe, asserting that at the time the photographs were taken, Mr. Bonilla was not standing on the roof of the vault and was not seen using a jackhammer. However, the photograph clearly shows Mr. Bonilla standing on scaffolding, eye-level with the roof of the vault, with his hand on the roof, conceivably indicating that the workers were planning to continue on with the demolition of the vault's roof (without bracing). Yet, Mr. Taffaro made no inquiry. As stated by Mr. Householder in his review of Mr. Taffaro's photographs, "even a layman who is not a trained design professional should have recognized that partially removing the walls without providing substitution supports made the ceiling slab unstable." Mr. Householder saw no evidence in the photographs of substitute supports. Additionally, after reviewing Mr. Taffaro's photographs, Mr. Labarre opined that "if demolition were to

16

continue on the vault with no temporary supports, there was a potential for problems."

While VRA is correct in asserting that Tuna was responsible for safety on the Project, Mr. Taffaro acknowledged in his deposition that if he were to see anything unsafe at the site, he would notify the contractor's superintendent. However, Mr. Taffaro spoke to no one with Tuna or with Mr. Bonilla's supervisor on the day of the accident.

Based on our thorough review of the record, we find genuine issues of material fact as to whether VRA was aware of Tuna's deviations from the contract requirements involving demolition, and whether VRA failed to identify and report an unsafe condition. Thus, we find genuine issues of material fact as to whether VRA owed a duty to Mr. Bonilla under the facts presented.

**CONCLUSION**

For the foregoing reasons, we find that the evidence produced in opposition to VRA's motion for summary judgment reveals the existence of genuine issues of material fact. Accordingly, we reverse trial court's June 30, 2022 judgment, which granted summary judgment in favor of VRA. The matter is remanded for further proceedings.

**REVERSED AND REMANDED**